Davis, J.,
delivered the opinion of the court:
The schooner Jane (Snow, master) was captured by a French privateer in December, 1800; afterwards she was retaken by a British cruiser, carried to a British port, and there libeled for salvage, which was paid. The only claim presented here for this loss is on behalf of the underwriters, who made it good. The case was once tried and the foregoing findings were filed. A motion for a rehearing is now made by claimants, who allege ■error of law in this: That the court, while- finding that the claimants had a valid claim against France after the conclusion of the treaty of September 30,1800, and before its ratification, also found that the United States were not liable for the loss sustained.
Whatever jurisdiction we have over claims of this class is .given by the legislature’s express grant, and the first step in the examination of any question presented as to them mustbe .a reference to the statute which gives, defines, and limits the powers of the court. (23 Stat. L., p. 283.)
This statute authorizes such citizens of the United States or their legal representatives as had valid claims against France, of a certain class, to apply to the .Court of Claims for relief, provided their claims existed prior to the ratification of the treaty of 1800.
*232 From this broad clause there are certain exceptions, to wit:That its provisions shall not extend to claims “ embraced ” in the convention with France of 1803, or to “ such claims growing out of the acts of France as were allowed and paid in whole or in part ” under the treaty of 1819 with Spain, or to such claims “ as were allowed in whole or in part ” under the treaty of 1831 with France.
That- this claim was not “ allowed and paid in whole or in part” under the treaty of 1819, with Spain, that it was not “ allowed in whole or in part ” under the treaty of 1831 with France, is not to be disputed. That it was not embraced in the treaty of 1803 we shall show later.'
The court has found already that the citizen, since deceased and now represented here by the claimant, had a valid claim for indemnity upon the French Government after the conclusion of the treaty of 1800 and before its ratification, but the-act of Congress also requires us to “ report all such conclusions-of fact and law as in [our] judgment affect the liability of the United States ” for the claim, and, in fulfillment of this demand, we have found that it was not relinquished to France by the United States in part consideration of certain national claims of France against the United States. This conclusion rests upon .the fourth article of the treaty of 1800, and is the conclusion disputed as error of law.
We do not propose again to analyze the correspondence and negotiations which led to the conclusion of the treaty of 1800, nor shall we again examine the history of the relations between the two countries antecedent to the 30th of September, 1800. All this has been heretofore most thoroughly presented and argued by the bar, and has been very carefully considered and discussed by the court. -
Turning, then, directly to the instrument itself, with all the light which previous examination of the whole subject has given us, we find that the negotiators had before them, as the subject for relief, acts of a certain class committed by France to the injury of the mercantile marine of the United States; acts which had endured for some years, and which were still continuing. In the much-discussed second article the negotiators provided for those injuries of this class which had already occurred, and stipulated that indemnity therefor should be the subject of future negotiation. This article was thrown out and; *233 in place of it was substituted tbe agreement relinquishing all such claims against France, in consideration of tbe relinquishment by France of her national claims upon the United States. This closed contention as to then existing claims, of the class generically known as “ spoliation claims.”
During the progress of the negotiations, which ended with the treaty of 1800, the predatory course of the French privateers continued; there was at that time not only neither telegraph nor steam-ships, but, by reason of the war between France and England, the means of communication between the executive of France and their subordinates were subject to interruption and delay. It was certain that orders could not for some time reach French cruisers and privateers, directing them to allow American merchantmen to pursue their voyages-unmolested, and it was no less certain that between the signature of the treaty and the exchange of ratifications injury would continue to be suffered by American commerce.
Having disposed of then existing claims for illegal captures, detentions, seizures, condemnations, and confiscations, the negotiators were forced to turn their attention to acts of the same nature which might arise in the immediate future. With this in view the fourth article was concluded.
This article embraced two classes of property: (a) That captured and “ not yet definitively condemned,” that is, not definitively condemned on the 30th day of September, 1800; and (6) that which might be captured before the exchange of ratifications. In each case the property was to be restored upon production of certain- specified proof, while contraband goods destined to an enemy’s port were excepted from the benefits of' the article.
It was further stipulated that this fourth article of the treaty should take effect upon date of signature, and if any property should be condemned thereafter contrary to the intent of the convention before knowledge of the fourth article should be obtained, the condemned property should without delay be restored or paid for.
This article does not seem to require interpretation. France had committed certain acts alleged by the United States to be illegal, acts conceded by France to be illegal, but for which she declined to make compensation unless certain contentions made by her were recognized by the United States as valid. No set-
*234 tlement upon this basis being possible, the negotiators on each side agreed to postpone the discussion of this branch of the broad subject committed to them, and did so in the second article — the article afterwards struck out. The same illegal acts were being continued; both sides desired them stopped; the property was of a nature to be restored (in mosteases at least); if not, it could be paid for. , Physical difficulties rendered it impossible to immediately arrest those actions of vessels of war and privateers, which both countries desired should cease in •order that the friction between the nations caused by the course of these vessels might be immediately removed; and in all human probability it would be long before the ratifications of the treaty were exchanged. To reach the desired end the modus vivendi of the fourth article was adopted, and. every case included in that article is, in our opinion, excluded from the class embraced in the second article.
The Jane evidently falls within the fourth article, as she was not captured until after September 30, 1800, when the treaty was signed.
This claim not being a second-article claim, unless there is ■some other principle or provision of law not discussed by us in the opinions heretofore delivered, which gives the claimants a right against the United States, we must adhere to the'findings already filed.
The treaty of 1831 disposed of several classes of claims then the subject of contention between the two Governments.
Articles I to IY, inclusive, treated of those contentions which are are now of particular importance. Article Y disposed of individual claims not covered by the preceding articles, while Article YII related entirely to national claims on either side, and in consideration of a tariff reduction by the United States, France abandoned by it certain claims under the Louisiana cession and agreed to a modification of the duties •on cotton.
Turning back to Article I, we find a provision for the payment by France to the Government of the United States of a named sum of money—
il in order to liberate itself completely from all the reclamations preferred against it by citizens of the United States for unlawiul seizures, captures, sequestrations, confiscations, or destructions of their vessels, cargoes, or other property.”
*235 Article III provided for the payment by the United States to the GS-overnment of France of a named sum of money—
“ for the purpose of being liberated completely from all the reclamations presented by France on behalf of its citizens or of the royal treasury, either for ancient supplies or accounts, the liquidation of which had been reserved, or for unlawful seizures, captures, detentions, arrests, or destructions of French vessels, cargoes, or other property.”
It can not be doubted that upon compliance with the terms ■of these articles — and they were complied with, that is, the money was paid — the claims described in them ceased to be on either side the subject of valid diplomatic contention. As between the nations these claims passed out of existence.
It has been said colloquially of one of the most important treaties concluded by the United States, the “Treaty of Washington,” signed May 8, 1871, that it was “built in compartments,” that is, that each separate subject of the many submitted to the negotiators was separately settled, so that the failure of one branch .of the treaty was without effect upon the other branches. Thus the settlement of the Alabama claims proceeded in a manner absolutely independent of the settlement of the claims submitted to the British-American Commission, or of the arbitration to adjust the San Juan dispute, or of the commission to arbitrate the fisheries question, and each of these points of discussion, as well as the others embraced in that treaty, such as the “ three rules,” and international transportation were independent each of the other and of all others.
Of course, in the negotiations all these points were discussed, and it is not unfair or unreasonable to assume that the mode of settlement of the one had influence upon the mode of settlement of the other. Possibly one side would not have conceded the “ three rules ” unless the other had conceded the Halifax Commission; possibly the transportation agreement might not have been made without assent to the San Juan arbitration. Undoubtedly in negotiation all the points were kept carefully in view, and the one might very properly be used by either side as an arm to secure assent to the other.
negotiation ended the treaty is a complete whole in the form in which it was concluded, to be interpreted as it stands according to the usual rules of statutory interpretation. The “ three rules” have never been presented to other nations, but *236 that does not in the least affect the Geneva award. The fisheries articles have been abrogated, but that does not touch the San Juan decision. The British and American Commission have closed their labors, but the transshipment clauses of the treaty are not impaired thereby.
Perhaps some of these treaty concessions would not have been granted unless certaiu other clauses relating to different subjects had been contained in the same instrument. This is speculative, but not unjustly so, when we find in one instrument intended to stand or fall as a whole, provisions linked together for subjects so entirely different in their nature; but into all this courts can not go; they must construe the instrument as-they find it. So much by way of illustration.
The treaty of 1831 covers four subjects — first, claims of a defined class against France; second, claims of a defined class against the United States; third, claims of citizens of the one country against the other country not included in the first two subjects; and, fourth, purely national claims as to tonnage dues., tariff, and the like.
' As to the first class, France was to pay a sum fixed in order to !l liberate itself completely from ” those claims. Article» I and II cover this subject, and no question is raised as to the payment therein stipulated.
As to the second class, the United States were to pay a sum fixed in order to be “ liberated completely from” those claims. Articles III and IV cover this subject, and no question is raised as to the payment therein stipulated.
The third and fourth classes are not important to our immediate purpose.
Each of these different subdivisions is complete in itself; no “ set off” of one class of claims against another class is apparent, yet each article of the treaty is in a sense dependent upon the other, and we are by no means prepared to say that France would have been held to payment of the first class had the United States failed to fulfill their obligations as to the second class, and vice versa. No such question now arises; the provisions of the treaty have been fulfilled on each side, and we have only to find whether the United States, in negotiating- and ratifying this instrument, sacrificed private rights for the public welfare, as it is urged they did in a surrender of certain individual claims to obtain a national advantage.
*237 Oil tlie 30fcli day of September, 1800, France held vessels not ■then definitively condemned; further captures would be made before the treaty became binding on the nations by exchange of ratifications. For all such captures as were illegal a valid diplomatic claim existed or would spring into existence. The fourth article had no effect upon the validity of such claims when they rested upon unlawful acts; their validity depended upon principles of law entirely outside that article. What the article did was to prescribe a remedy for the class of claims covered by it, and if that remedy were not accorded, as in many instances it was not, the claim continued as an element of international dispute, subject to future negotiation and settlement. Under the fourth article property captured, but not definitively condemned, was to be “ restored;” of course, if illegally captured and not restored, a claim remained for a money indemnity. Property condemned after the treaty’s 'date was to be restored or paid for; of course, if not so restored or paid for, the claim for indemnity still existed. No claim is quieted by the failure of a wrong-doer to fulfill a form of remedy agreed upon by him. Many of these captures were not restored or paid for, and remained subsisting obligations on the part of France after the treaty of 1800 had been ratified and the ratifications exchanged.
The treaty of 1803. did not affect claims of this class, as has been shown in our previous analysis of this instrument (Gray, administrator, v. The United States, 21 C. Cls. R., p. 393), which embraced debts and “ captures of which the council of prizes shall have ordered restitution, provided the claim was a valid one and the captor insufficient.”
This claim was in January, 1801, a valid claim against France, covered by the definition of the fourth article of the treaty of 1800. The property was not restored or paid for. The claim was not embraced in the treaty of 1803, therefore it was still alive in the form of international contention when the treaty of 1831 was concluded, and there is nothing on the face of that treaty to show any “ set-off” of individual Ameri-ican claims against French demands. If there was in fact such a “set-off” — and it is argued that there was — this fact will probably appear from the negotiations antecedent to the treaty. Therefore these negotiations must be examined.
In his general instructions to Mr. Brown, minister to France, *238 dated December 23,1823, Mr. J. Q. Adams called that minister’s attention to—
“ (1) The claims of many citizens of the United States upon the French Government for indemnity.
“ (2) The pretensions raised by the French Government to-special and exclusive privileges in the ports of Louisiana, by virtue of the eighth article of .the Louisiana cession convention, etc.” (Ex. Doc. 147, H. It., Twenty-second Congress, second session, 1833.)
In August following he desired Mr. Brown to renew “with earnestness the application for indemnity to our citizens for claims notoriously just and resting upon the same principles with others which have been admitted and adjusted by the Government of France.”
These individual claims were steadily pressed upon France, and a summary of the efforts made by the United States Government in this matter is contained in a long and full instruction from Mr. Olay to Mr. Brown, dated May 28,1827 (id., p. 5).
In 1829 (July 20) Mr. Van Burén instructed Mr. Bives as follows :
“The claims of our citizens are a subject of the deepest interest, not only on account of their amount, the aggravated injuries of which they are the results, and the great length of time during which those injuries have remained unredressed, but also, because a continued disregard on the part of France of the reiterated appeals which have been to her justice, must have an unavoidable tendency to jeopard the friendly relations now happily existing between the two countries, and which it is the earnest desire of the President to |)reserve.”
Mr. Van Burén then made a classification of the claims, with the preface that—
“ This classification is made from materials of an uncertain character, and it is probably in many respects incorrect. But as it is not to be made the basis of a specific allowance, but merely to facilitate your discussions and enable you to judge more understandingly of such offers as may, in the course of your negotiation, be made by the French Government, the probability of errors in description and amount is not regarded as detracting much from its usefulness.”
The following is Mr. Van Buren’s classification:
First class. — Claims prior to 30th September, 1800, recognized by the fourth and fifth articles of the treaty of that date, hut either pretermitted by the treaty of the 30th of April, 1803, or through various causes not included in the settlement made at Paris by the board of claims, and remaining in force by virtue of the treaty of 1800, and the tenth article of that of 1803, amounting, per schedule herewith, to. 11,488,833.99
*239 Second class. — Claims accruing between tbe 30tli September, 1800, ancl the 30fch of April, 1803, for debts contracted within that period, and provided for by the twelfth article of the treaty of 1803, amounting, as per schedule, to. $134,786.06
Thwd class. — Claims accruing between the 20th of September, 1800, and the 30th April, 1803, from all causes other than debts and captures made between the date and ratification of the treaty of 1800, those debts and captures being provided for by the fourth and fifth articles of that treaty, and included in the first class, amounting, as x>er schedule herewith, to. 75,704,53
JPomih class. — Claims between the 30th of April, 1803, and the year 1805, and arising from all causes whatsoever, amounting, as per schedule herewith, to. 1,065,081.98.
JFifth class: (1) Claims subsequent to 1805, chiefly growing out of the decrees and orders of the French Government, on which no- final condemnation was passed, amounting, as per schedule herewith, to. 6,256,647.69
(2) Claims of the samonabure,but finally condemned bythe council of prizes, council of state, or by imperial decisions and orders, amounting, as per schedule herewith, to. 3,026,231.84
Aggregate (exclusive of interest). 12,047,286.09
Analyzing this classification, we find that, of a total claim amounting to something over $12,000,000, the second class covering only debts, the fourth class covering claims arising after April 30, 1803, and the fifth class covering claims subsequent to 1805, have no relation to the subject now under discussion. They amount in all to $10,482,747.57. The other classes, to wit, the first and third, amount to $1,564,538.52. Of the third class, which amounts only to $75,704.53, a portion are apparently not fourth-article claims; but it is probably sufficient for our present purpose to assume that the fourth-article claims were roughly estimated by Mr. Van Burén at a sum something over $1,500,000.
The same estimate put all the individual claims, fourth article and others, at over $12,000,000, while the commission organized under the treaty of 1831 (4 Stat. L., p. 574) allowed $9,362,193.47, and France paid in money therefor, that is, for all the claims named in Article I of the treaty of 1831, 25,000,000 francs; in round numbers, $5,000,000, or about 59 per cent, of the amount subsequently allowed by the commission of 1832. (Ex. Doc. 74, Senate, first session Forty-ninth Congress, pp. 128 and 129.)
Claims for 104 vessels were presented to this commission and classified under the heading “ List of claims for spoliations on American commerce by the French prior to the ratification of the convention of September 30,1S00.” Of these four were *240 allowed, to wit, the ship Dominic Terry (Fleming, master), ship Nancy (Allen, master), brig Nathaniel (Butherford, master), brig Traveller (Lee, master). The awards therefor amounted to $332,623.16. These four vessels were captured in October, November, and December, 1800. (Senate Doc. 313,29th Cong., 1st sess., 1846.)
It is urged that claims like that now before the court were not only admitted, but expressly provided for by the treaty of 1800; that the treaty provisions were not carried out by France; and, finally, that under the treaty of 1831 these claims were released to France for a national consideration.
The following points in this proposition may be admitted : The claim at bar was a fourth-article claim; as to it France did not fulfil] her stipulation; the treaty of 1831 released France from further liability for it. There remains to be considered whether this release was made in consideration of such national benefit as operated to throw upon the Government of the United States any liability to compensate individual claimants.
In the first place, reliance is placed in the figures above cited from Mr. Yan Burén, which are used briefly as follows : Claims presented, $12,047,286.09; from this deduct first and third class claims (that is, fourth-article claims), $1,564,538.52, and a balance is shown of $10,482,747.47; while the board organized to distribute the fund of 1831 allowed $9,362,193,47.
If we understand this branch of the argument correctly it amounts to this: That in the course of the negotiations, in which French claims of various kinds were advanced against claims pressed by the United States, some sort of a middle ground was reached by the negotiators, who had before them American claims individual in character, also French claims individual and national, among which the most important were those relating to the tariff, which rested upon the Louisiana purchase. There was a yielding on both sides, perhaps; there was certainly a yielding as to the American individual claims, probably for the purpose of obtaining certain other advantages,1 a yielding which resulted in the acceptance of $5,000,000, instead of a sum approximating the rough estimate made by Mr. Yan Burén of $12,000,000 and over. The abandonment of the fourth-article claims would give a sum based on the Yan Burén estimate (admittedly not accurate) of about $1,000,000 -over the amount actually awarded by the commission of 1832; *241 from all wliiob it is not unfair to conclude that the representative of the United States who negotiated tlie treaty struck fourth-article claims from his list in an endeavor to reach a result on all the issues whose solution was confided to him. This kind of argument is unusual in. its nature, and yet is only by some such argument that any theory can be maintained as to the proceeding by which a diplomatic negotiation reached the published result.
Mr. Yan Buren’s statement, made up from claimants’ estimates not analyzed by the Department of State, was, roughly speaking, some 60,000,000 fraucs. Yet Mr. Dives, as we shall afterwards see, paid little attention to this schedule, and was satisfied that his recovery of 25,000,000 francs was sufficient. At th.e same time the difference of over 50 per cent, between the Yan Burén estimate and the recovery in the treaty is very large.
It is urged that the figures show a deduction (that is a surrender) of the fourth-article claims, and that this surrender was for a national advantage; and these private rights having been surrendered for the public good, the claimants should receive compensation therefor from the Government.
Continuing the examination of the correspondence, we find an instruction from Mr. Yan Burén to the minister in Paris, from which we make the following extract:
“ The reasons which constrain this Government to resist the claims of France in regard to the Louisiana treaty are equally imperative in preventing a deduction from our claims on that account. The result of such a course would be claims on our Government from those of our citizens who are interested in those we are presenting against France for the amount thus deducted. * * * If the United States consent to discharge France upon receiving a measure of indemnity which falls short of the true amount of the claims of their citizens, it must be from other considerations, and the course of your negotiation must always besuch as to preclude a contrary inference. You will find no> difficulty in possessing the French Government fully of the views of this upon that subject, and the applications which yet continue to be made to it tor claims alleged to have been abandoned by the treaty of 1800 will serve to confirm their correctness. (Ex. Doc. 147, H. R., 22d Gong., 2d sess., 1833, p. 30.)
The effect of this clause of the instructions is, that Mr. Yan ■Burén refused to set off national claims against individual *242 claims, but reserved a possibility of diminishing the proper indemnity for individual claims u from other considerations.” In the next paragraph he hints that in view of the sacrifices of France, the state of her finances, the legislative situation, and the like, he might receive as a finality, as adjusting all matters in difference between the two countries, a gross sum, to be distributed among the American claimants, provided this sum should bear a reasonable proportion to the actual extent of the claims.
The claim of the heirs of Beaumarchais was evidently anticipated with some anxiety by Mr. Van Burén. This was a claim for supplies furnished by their ancestor to the United States during the war of the Revolution, and as to it Mr. Rives was instructed (ibid., p. 32) that if brought forward—
u In consideration of the great amount of claims which our citizens have upon France, and of the sincere desire which the President entertains to obliterate any source of future contention between the two G-overmnents, lie would not object to deduct the 1,000,000 of livros claimed by the heirs of Beaumarchais ñom the amount allowed by France to satisfy theclaims of American citizens, provided that that be such, in your opinion, as will satisfy all the claims which, upon a close examination, shall be found justly chargeable to her.”
This, of course, was a plain suggestion to sacrifice a portion of the citizens’ claims for the purpose of satisfying an alleged national obligation on the part of the United States to French citizens.
In April, 1830 (ibid., p. 36), Mr. Van Burén wrote Mr. Rives in substance that the President desired no abatement1- of the indemnities claimed; that he was anxious to obtain satisfaction for all just claims whatever of citizens of the United States without regard to the classes to which they belonged; that he was disposed—
“ to yield none, but upon unavoidable necessity, and to avert a greater injury, by foregoing the opportunity to procure a satisfactory adjustment of the best and largest portion of them # # # Tim President is well aware, however, that there are considerations appertaining to the subject, which may lead that Government to insist upon a reduction in reference to particular classes of the claims; or perhaps the entire abandonment of such by this. In that case it may be found best to yield something of what, under other circumstances, might be insisted upon; on our part, for .the sake of obtaining all that is practicable. Should the necessity of doing this, or to forego- *243 the opportunity of effecting an arrangement otherwise desirable, become apparent and imperious, the President in that case would agree to the adoption of such a course.”
Mr. Yan Burén then proceeds in the same tone to indicate to Mr. Rives that the abandonment or reduction of certain classes of claims is left to his judgment, to be guided by the prejudices of the French Government and the circumstances, but adding this significant clause—
“ The President, however, concurs in the opinion which you have expressed, that, if reductions are insisted upon, the claim for interest and those originating in transactions antecedent to the treaties of 1800 and 1803, are the classes in which concessions should be made. You are therefore hereby invested with his authority to abandon these or a portion of them, under such renunciations as may be required by the French Government, if it should appear that this is made a sine qua non to the successful prosecution of the residue; but this is not to be proposed except in the last resort. (See also ibid., p. 45, Mr. Yan Burén to Mr. Rives, 22 Dec., 1830; as to Beaumarchais’s claim, -see Mr. Yan Burén to Mr. Rives, ibid., p. 46.)”
So then Mr. Rives was authorized to reduce, if necessary, individual American claims, to abandon some classes if forced to do so, particularly those originating in transactions prior to the treaties of 1800 and 1803, and to settle the Beaumarchais claim stated by the French (ibid., p. 191) at 2,699,999 francs principal and 1,000,875 francs interest.
The negotiations in France, which led to the treaty of 1831, began with Mr. Gallatin, but no substantial advance had been made towards a settlement of the claims when Mr. Rives arrived in Paris. It is noteworthy that in all the earlier part of Mr. Rives’s efforts to obtain compensation for American claims no serious counter-demand of the same nature was made on the part of France. France had claims of her own, both individual and national, but Prince Polignac, so far as the printed correspondence shows, did not urge them upon Mr. Rives as in any way affecting the principle or amount of the American demand.
In February, 1830, Mr. Rives prepared a draught treaty on which he thus commented in a dispatch to the Secretary of State (ibid., p. 87):
“ The first article, you will perceive, provides for the cases in regard to which I understood that the minister and myself had agreed. The particular views which determined the shape of *244 tbe second article have been already explained. The claims originating prior to the conventions of 1800 and 1803, and forming the subject-matter of the two or three first classes of claims mentioned in my instructions, 1 considered as virtually embraced by these articles, particularly by the clause of the first article relating to supplies and debts, and the clause of the second article relating to condemnations in contravention of the convention of 1800. The latter clause was framed mainly with reference to condemnations under the Berlin and Milan decrees prior to July 31,180;', which, besides their illegality on general principles, were in violation of the twelfth, thirteenth, and fourteenth ar ticles of the convention of 1800, which secured to each party in time of war the benefit of an unmolested commerce with the territories or in the productions of the enemies of the other, but it was recommended to me by the further consideration of making France responsible, at the same time, for the more ancient claims arising from condemnations contrary to the tenor of the fourth article.
“As the classes of claims here referred to had not been insisted on in any of the discussions which have taken place between the two Governments for tbe last twenty-five years, and •seemed indeed to have been mutually considered as either settled or abandoned, I thought it would have a very bad effect to bring them forward distinctly and avowedly. Indeed, I supposed that the motive for comprehending them in my instructions was not so much a distinct recognition of them as to swell the aggregate amount of our claims in the event of a proposition for a compromise en bloc, and thereby to enable us the better to obtain a sum adequate to cover all the claims of a more unquestionable character.”
Mr. Van Buren’s instructions of April, 1830, to which we have already referred, is not inharmonious with these views of Mr. Bives, for it permitted him to surrender the fourth article claims and those for interest
The first article of the Bives draught (ibid., 90) covers “ irregular captures, seizures,” etc., where “ the vessels and cargoes have not been definitively condemned by the council of prizes,” cases of unlawful destruction at sea, debts due citizens of the United States for supplies, etc. It was understood that these classes of claims were in principle admitted as valid by Prince Polignac. The second article provided compensation for condemnation of vessels and cargoes in the following cases, to wit:
“Where the condemnations were in contravention of thecon-vention of 30th September, 1800, between France and the United States * * * . where, from anj other circumstance *245 or consideration, tbe mixed commission hereinafter provided for shall determine that His Majesty’s Government is justly bound to make compensation, whether the condemnation was by virtue of the before-mentioned decrees [of Berlin and Milan], or any other decree or order, or upon some other pretense.”
Upon reading this draught, Prince Polignac immediately objected that it contained no provision for French claims, mentioning particularly those founded on the eighth article of the Louisiana treaty (ibid., p. 93). The discussion now continued with the Louisiana question as the principal contention until the revolution of July, 1830. Much delay ensued, and it was not until December that the negotiation was seriously resumed. Mr. Eives was then asked for a tabular statement of the American claims, which, after some hesitation, he unofficially gave, compiling it from materials in the legation, chiefly from the schedules communicated to Congress by the Department of State, but without any particular classification. A commission had been meantime-created by the French Government for the investigation of American claims, but their report was not submitted to the minister of foreign affairs for some time. Mr. Eives wrote home (March 30,1831, ibid., p. 108), before he had seen the report, that he understood the commission stood 4 to 2, the majority defending the principles of the decrees of Berlin, Milan, and Eambouille:, while admitting that their irregular or abusive application might authorize a demand for indemnity, the result being that they considered only three categories of claims admissible, to wit, vessels burned at sea •, captures made after the 1st of November, 1810, the period fixed for the report of the decrees; and cases in which the decrees might have been applied retrospectively. Later (ibid., p. 170) Mr. Eives learned that the report had not been made, but when made would fix the indemnity at 10,000,000 francs. He immediately proposed settlement by payment of a sum en bloc, not indicating any details by which such a sum was to be reached, but inviting a suggestion (ibid., p. 172).
After again advancing the Louisiana question, General Se-bastiani proposed a final and complete settlement for 15,000,000 francs. This was rejected as “ derisory.” At alater interview, after Mr. Eives had (ibid., p. 176) analyzed the tabular statements prepared by him, General Sebastiani offered as an ultimatum 24,000,000 francs, payable in six annual installments. *246 Air. Rives retorted with a demand for forty millions “ as a compromise.” Towards the last of May (1831) Mr. Fives signified his willingness to meet the French “ at a middle point between the two sums” (ibid., p. 181). This was taken under consideration, but was finally rejected (ibid., p. 184) with a recurrence to the offer of twenty-four millions “ as a most solemn ultimatum.”
This brought thenegotiation down to the middleof June, 1831, when Mr. Rives submitted a draught convention. The two important articles of this draught are the first and fifth:
“Article 1. His Majesty the King of the French engages to pay to the Government of the United States the sum of twenty-five millions of francs, in acquittal of the claims preferred by said Government in behalf of its citizens, on account of illegal captures, seizures, sequestration, condemnation, and destruction of their vessels, cargoes, and other property, by the armed ships of the state or of private individuals, and by the tribunals, officers, and other authorities of France; which sum of twenty-five millions of francs the Government of the United States consents to receive and distribute among the various claimants.
“Aet. 5. The Government of the United States does hereby renounce all claims which are or may be preferred on account of seizures, captures, or other wrongs enumerated above; and his Majesty the King of the French on his part abandons the claims hitherto preferred by the French Government against the United States, more especially those on account of the execution of the eighth article of the treaty of cession of Louisiana.”
Mr. Rives thus states his reasons for the course pursued by him:
“ Finding nowhere a more authoritative estimate of the just amount of the claims of our citizens than that contained in Mr. Gallatin’s dispatch of 14th January, 1822, to Mr. Adams, and in which he expresses the opinion that all the claims of every description justly due do not exceed $5,000,000, two million of which, he adds, there can be no expectation ever will be obtained, I thought no time ought to be lost in securing the bene-, fit of the proposition now made by the French Government.”
With this view he prepared the draught of which the minister of foreign affairs approved in principle, objecting, however, that the fifth article renounced French claims, particularly those founded on the Louisiana treaty, and adding that there were just individual claims “ which the American Government could not certainly refuse to satisfy in the moment of obtain- *247 lug justice for its owu citizens,” and that their claim as to the Louisiana treaty was too important and valid to—
“be abandoned without a fair and just equivalent, especially after the liberal proposition they had made for the payment of the claims of our citizens. I [Mr. Eives] observed that no allusion having been made in the course of our negotiations to the claims of French subjects, I had taken it for granted that there were none which were supposed to merit the patronage of the French Government; and that with respect to the Louisiana question, I had flattered myself that the present Government of France would no longer insist on a pretension which had been heretofore used chiefly as an expedient for evading the justice due to our citizens (ibid., p. 185).”
The claims of France, other than those under the eighth article of the Louisiana treaty, were stated by Count Sebastian, at 4,689,241.41 francs, of which 101,534.41 francs were alleged to be due the treasury of France for four drafts on account of the cession of Louisiana, while the amount of the so-called Luxemburg claims and claims of Frenchmen to Indian lands were left unestimated. After discussion the minister, agreed “ to accept a gross sum of 1,500,000 francs in satisfaction of all the claims.” Upon this arrangement Mr. Eives thus commented:
“ To get rid of this claim [Beaumarchais], amounting alone, to more than 3,500,000 francs, and of others (among which are some of clear justice) amounting to one million more, for a gross sum of 1,500,000 francs was an arrangement so obviously advantageous for the United States that I did not hesitate to adopt it (ibid., pp. 210, 211).”
This point out of the way, discussion ensued as to the eighth article of the Louisiana cession; finally an agreement was reached upon this point also, and the treaty was signed.
Four days thereafter Mr. Eives thus commented upon the completed instrument:
“ It will be perceived that the whole sum which the French Government is to pay on account of the reclamations of citizens of the United States for unlawful seizures, captures, etc., is 28,500,000 francs [this must be inclusive of interest]. In regard to the adequacy of this sum to pay the just claims of our citizens, I have already had the honor to refer to the dispatch of Mr. Gallatin of the 14th of January, 1822. * * * If the opinion here expressed be correct, and certainly none enjoys or is entitled to more respect, the sum stipulated to be paid by the French Government will be amply sufficient to satisfy all the just claims of our citizens of every description comprehended in the scope of the negotiation.”
*248 Mr. Eives adds that the schedules, founded on statements of the claimants, which had from time to time been presented to Congress, did not furnish a safe guide either in regard to the validity or the amount of the claims, and he thus concludes, (ibid., p. 214):
“An arrangement which, amid so many difficulties, has secured for claims of our citizens (prosecuted in vain for the last twenty years, and a large portion, if not the whole, of which has been considered desperate) a sum sufficient, in all probability, to pay every cent justly due, and nearly treble the amount' pronounced to be due by the commission charged with their examination here; which has, at the same time, extinguished claims of French subjects against the United States-to the amount of near 5,000.000 francs by a stipulation to pay. a million and a half; and has finally gotten rid of a most embarrassing claim (founded on the language of a* treaty) of perpetual privileges in the ports of oneof the States of the Union,. * * * can not, I trust, fail to be satisfactory.”
Mr. Gallatin did nob have the fourth article claims particularly in mind, but Mr. Eives considered them carefully and had them in remembrance during his negotiations; this appears emphatically in his first treaty draught and his comments thereon (supra).
It will be seen from a review of these negotiations that the-claims of France other than those based upon the eighth article of the Louisiana cession were not pressed upon the United States, until the close of negotiations was nearly reached, and that then they were settled with little delay or friction. This class of claims played no important part at any time, and may be regarded as an incident not seriously considered by either party.
It may be a matter of curious inquiry as to what effect the admission of these claims had upon the allowance of the particular sum finally conceded to the United States by France.. Twenty-four millions had been fixed as “ a most solemn ultimatum,” yet the amount granted was twenty-five millions. Between the ultimatum and the treaty were introduced the French, individual claims, finally fixed in amount at one and one-half millions, and yet Mr. Eives does not explain how he secured the advance to the United States of one million over Count Sebastianas “ dernier mot.”
The negotiation with Prince Polignac was almost entirely in relation to the American claims, the general scheme being of- *249 a reference to a mixed commission. The Louisiana question' was by no means lost sight of by the French, but the United States steadily refused to couple this with the indemnity for citizens’ claims.
The contention on our side seemed (from confidential papers, afterwards discovered) to be in a fair way of favorable adjustment when the revolution of July occurred, and after several changes of ministry Count Sebastiani finally came to the foreign office and vigorously conducted the negotiation to a conclusion in the treaty of 1831. In this negotiation the prominent points were the American claims and the Louisiana treaty;. individual claims on our side, national claims on the side of France. Not until the very close of the discussion did French, individual claims appear as in any sense a disturbing element, and they were quickly and harmoniously settled. To be sure,, among these claims covered by the third article of the treaty of 1831 were some demands of the French treasury. They were based upon drafts issued for the Louisiana purchase, and were too small in amount to have had any serious effect upon-a negotiation of such importance. No argument, therefore, can be drawn from the appearance of this treasury claim in the third article.
Neither Mr. Rives, Prince Polignac, nor Count Sebastiani ever coupled the American claims with those of France under the Louisiana eighth article in any such sense as might lead to an inference that the one class was to operate upon the other by way of setoff. On the contrary, every document before us-shows an absolute an d distinct line draw between them. France only insisted that the Louisiana question should be settled at the same time with the American claims; in this contention' France was successful; but France did not contend more than this; she ‘did not urge that the Louisiana settlement should, operate as a reduction of the sum en Moo to be allowed in behalf of American claimants. All she urged was that both subjects should be settled at the same time; they were so settled,., but the negotiations as to each of the branches of the treaty were separately conducted.
Taking up the negotiation at its crisis, just before its conclusion, it appears that our minister offered to take a gross sum. for American claims. This proposition was in principle accepted, but the amount offered by France being, in the minis *250 ter’s opinion, to.o low, be made a counter demand, and finally the sum of twenty-four millions was offered by France. This is only one million short of what was afterwards allowed (which the minister thought ample), and he thereupon submitted his draught of a treaty, which, in so far as it went, was practically accepted. Then the French individual claims were advanced and quickly disposed of, and the Louisiana question was not much longer delayed.
The result was that Mr. Eives obtained twenty-five millions for his claims, as against the twenty-four-million “ultimatum”; that he obtained this advance of a million after the submission of his draught, which named twenty-five millions, but was founded upon the twenty-four-million proposal; that he settled the five million or#so French claims for a million and a half, and the Louisiana question by a mutual tariff adjustment, covering wines on the one side and cotton on the other. We fail to find in this negotiation any interlacing of the one subject with the others, or any indication of a bargain or of a “set-off” of one class of claims against the other.
The result of the commission organized under the act of 1832 tends to show that Mr. Rives was incorrect in his estimates, or that he differed from the commission as to the law, but it shows no more than this. It seems to us that Mr. Rives, in his assiduous efforts at a fair adjustment through the allowance of a gross sum, agreed to accept an amount which, in his judgment (afterwards confirmed by his superiors through the ratification •of the treaty), was sufficient to indemnify all citizens having just claims. By this settlement France was freed from further responsibility.
The commission of 1832 (4 Stat. L., p. 574) was created “to receive and examine all claims which [might] be presented to them under the convention between the United States and France,” of 1831, “ which [were] provided for by the said convention, according to the provisions of the same, and the principles of justice, equity, and the law of nations.”
As the first article of the treaty embraced all claims preferred ■against France by “ citizens of the United States for unlawful seizures, captures, sequestrations, confiscations, or destructions of .their vessels, cargoes, or other property,” claims within the classification of Article IY of the treaty of 1800 would seem to fall within the commission’s jurisdiction. Such was the un *251 derstanding of the then claimants who presented claims of this class to the board; four such claims were allowed, thus admitting the principle that such claims were “ provided for by the ” convention of 1831; all other claims of this class were, however, rejected, and upon the following grounds (Kane’s Notes, p. 72):
“In interpreting this article (Article IY, treaty 1800) the commissioners decided that it did not extend to those cases in which, by acts beyond the control of France, it had become essentially impossible for her to restore the captured property. It included two classes; the first of cases in which no condemnations had taken place, in favor of which it stipulated restitution without any alternative; the second of condemnations made after the signature of the convention and contrary to its provisions, as to which it engaged that the property condemned should be restored or paid for. In regard to the former class it will not be contended that France bound herself, absolutely and without qualification, to restore pro£)erty which had passed out of her possession by recapture; and as to the latter, the provision for compensation where restitution was impracticable by the very words of the article applied only to cases of condemnation. Claims, therefore, for property which had been captured by the French before the 31st'of July, 1801, and which Avas recaptured and so became charged with salvage, were held not to be protected by the fourth article from the operation of the general release, and they were accordingly disallowed.”
Article IY granted restitution in case of condemnation, but made no provision for the payment of .damages or indemnity for detention or for depreciation in the value of goods by reason of deterioration; loss of market, etc,; claims of-this nature were presented to the board of 1832, and were disallowed for the following reasons (Kane’s Notes, p. 88):
“The decree of the council of prizes, when in favor of the •claimant, directed restitution of the captured property dans Vétat on il se trouve, in its actual condition; or, if it had been sold under judicial sanction, a payment over of the proceeds. The claimants,however,demanded an additional compensation for the damage they had sustained by the arrest and detention of their property, and as this was refused by the council they presented similar claims before the board. These formed the class No. 916, and were disallowed. Damages are awarded •only as the punishment for seizures plainly unlawful, and as the treaty directed the property to be restored without reference to the lawfulness or unlawfulness of the arrest, the council of prizes could not have decided otherwise than they did. The terms of the fourth article applied to all captures alike, *252 and under the fair construction which it received vessels were restored which were unquestionably good prizes. The remedy was conditional and specific — on production of the passport, restitution. Had it been, intended to go further the words of the twenty-third article would have been found also in the fourth, and the claimants might then have rightfully expected satisfaction and reparation for all damages. Such, very briefly stated, were the grounds on which these claims were refused allowance.”
With all respect to the members of this board we are unable to concur in the reasoning by which they reached this result. It seems to us that as to illegal seizures and condemnations the fourth article provided a remedy simply, in no manner affecting the right. The right sprung from the unlawful injury and existed independently of the fourth article. Lawful seizures of course stood upon an entirely different ground. It was only as a generous and friendly act that France agreed to restore vessels so condemned, and as to them the owners benefiting by this act of grace could claim nothing more than the fourth article gave them. But by an unlawful seizure alone a valid claim arose requiring no treaty provision to give it life, but demanding a remedy which, as between the nations, could only come through a treaty provision.
At the close of the commission of 1832 we find the situation to have been this: Fourth article claims had been pressed upon the French Government; nowhere does it appear that they were abandoned, much less that they were used as a set-off to obtain certain national advantages. A treaty was concluded which freed France from the claims by embracing them within the definition of its first article. A commission, created by the United States as their agent in the distribution of the fund paid by France, allowed some of these claims, very few, it is true, but still some, and disallowed the rest. We are not inclined to agree with the reasoning upon which this disallowance was made, but the commission clearly acted within the powers granted them.
It is not important to this discussion, but is of interest to-note that the commissioners rejected claims arising from captures made prior to September 30,1800; that is, second article-claims. These claims, of course, were not within their jurisdiction. (The Caroline, the Orlando, Doc. 313, Senate, Twenty-ninth Congress, first session.)
*253 “A government which neglects properly to present tbe claim of one of its citizens to a foreign government, in consequence of which such claim is lost, is not necessarily bound to make good the claim. The argument of the abstract right is strong, but as the j ustice obtainable from foreign nations is at all times, and under every state of things, very imperfect, and as the only alternative in cases of denial of justice is the abandonment of the claim or war, a nation by abandoning the claim, after exhausting every specific expedient for obtaining justice, neither partakes of the injustice done nor makes itself responsible to the sufferer; for war, even if it eventually obtains justice for that sufferer, secures it by the sufferings of thousands of others equally unmerited and which must ultimately remain unindem-nified. And mere inability to obtain justice can not incur the •obligation it is unable to enforce.” (Wharton’s International. Digest, Yol. II, i). 707; citing 5 J. Q. Adams’s Memoirs, 383. See also Eeports Committees, Twenty-fifth Congress, second session, Eeport No. 444, p. 31.)
Wc do not find that the United States surrendered fourth .article claims for any advantage, national or other; in fact, there is no record of any surrender whatever, nor is there any reason to suppose that these claims did not form an element in the estimate of Mr. Eives. There seems to have been no laches on the part of the Government in pressing the claims, and if money enough was not secured to pay them there is thereby no obligation thrown upon the Government to indemnify the claimant. The Government is bound to activity in the protection of the citizen; it is bound to fair dealing; it is bound to compensation if the citizen’s rights are sacrificed for the public advantage; but it is not bound to achieve the impossible or to sacrifice the welfare of the public in a citizen’s behalf. There may be extreme cases where Congress very properly compensates a loss sustained by a citizen when it is not for the public benefit to make an urgent demand therefor upon a foreign government. Such cases, however, do not spring from a right, but are rather founded upon abstract justice; the allowance is rather sentimental in nature than legal.
We have held that second article claims were sacrified for a national advantage, and therefore the Government became liable over to the citizen. But as to those claims there was a set-off, and French national claims against the United States were surrendered in consideration of the surrender of American individual claims against France. A national advantage was thereby sus'ained by the direct sacrifice of individual rights. *254 No such facts appear as to fourth article claims; as to them the Government acted vigorously and made the best treaty arrangement it could.
As to the commission, the claimants went voluntarily before it; the establishment of such a commission was a reasonable and proper method of executive administration, and to hold that now, after the lapse of fifty years, its decisions can be reopened by this court because incorrect in law would lead to the establishment of a most dangerous principle to which we can not accede, unless express power be given us to that effect by the Congress.
The commission’s decision appears to us incorrect, but is as binding and final as that of any similar commission which has since existed.
We are directed to report to the Congress “ all such conclusions of fact and law as may affect the liability of the United States” for the claims submitted to us, it being the evident desire of that body to obtain full information as to the claims in aid of intelligent action upon them. In this view we add these final considerations. It was in many instances impracticable for complainants to comply with the technical demands of the fourth article of the treaty of 1800. This was particularly true of prizes taken in the West India Islands. (Bx. Doc. 102, Nineteenth Congress, first session, pp. 833,834, and cititations in previous opinions of this court). The commissioners of 1832 rejected many of the fourth article claims because the technical formalities prescribed in this article had not been complied with, and the claimants thus failed to obtain redress, although many of the claims were probably meritorious.
No further demand can now be made on France, and no redress can be expected other than that which a sense of justice or a spirit of generosity may impel the Congress to award.
We do not consider claims of this class to be such rights, to be so founded on law as to permit a finding by us that the United States became legally liable to make payment for them, and we use the words “law” and “ legally” in this connection in the sense given them in our previous opinions, to wit, that under the act of 1885 a claim is legal when founded on law, even if not enforceable in a court of law; and the law as to which we have to advise Congress is not the law administered in common-law courts, which do not have jurisdiction of the *255 rights of the citizen against his Government, but the law enforceable within the jurisdiction of the legislative branch of the Government.
Motion denied.