ARIS GLOVES, INC.

v.

The **UNITED STATES.**

No. 348–68.

United States Court of Claims.

Jan. 23, 1970.

Edward L. Merrigan, Washington, D. C., atty. of record, for plaintiff; Smathers, Merrigan & O'Keefe, Washington, D. C., of counsel.

Bruno A. Ristau, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

This case involves a claim by Aris Gloves, Inc., a California corporation, that certain of its properties located in East Germany and Czechoslovakia were unlawfully taken by the United States in violation of the just compensation clause of the fifth amendment and in breach of an implied contract by the Government to fully compensate plaintiff for its losses. The controversy is now before this court on defendant's motion to dismiss or for summary judgment and plaintiff's cross-motion for summary judgment. We find as a matter of law that, based on the particular facts of this case, plaintiff is not entitled to recover either under the fifth amendment or on the basis of an implied contract. Consequently, for the reasons

hereinafter shown, defendant's motion for summary judgment will be granted.

Prior to the outbreak of World War II, plaintiff was the owner of three glove manufacturing plants—two of which were located in Czechoslovakia and one in East Germany. When the United States entered the war in December of 1941, all of the above-mentioned properties were seized by the Germans on the ground that they were United States enemy property. Toward the end of the war, in early 1945, the territory in which plaintiff's three plants were located was liberated from German occupation and control by the United States Army, and plaintiff's possessions came under the authority of the United States Military Command. This country remained in control of this area until August 2, 1945, when the Treaty of Potsdam [1] was signed, whereby all of Germany was divided into zones of occupation—each zone being supervised by one of the major Allied powers.

The area in which plaintiff's East German plant was located was incorporated into the Russian zone of occupation. Thereupon, in accordance with the Potsdam Agreement, which authorized the Union of Soviet Socialist Republics (U.S.S.R.) to dismantle and remove all industrial equipment in the eastern zone of occupation as soon as possible, Russia proceeded to dismantle and remove the industrial equipment and machinery from plaintiff's East German plant. At or about the same time, the territory in Czechoslovakia containing plaintiff's other two plants was released from United States control and restored to the Czechoslovakian government. Thereafter, plans were formulated by Czechoslovakian officials to restore all wartime confiscations to their rightful owners. However, before this restitution program could be carried out, a Communist regime took control of the Czechoslovakian government, and plaintiff's plants were nationalized. Consequently, as a result of the war, all three of plaintiff's glove manufacturing plants were confiscated, but without the payment of any compensation by any of the three countries involved (Germany, Russia, or Czechoslovakia).

Several years later, Congress passed the War Claims Act of 1948 [2] which allowed for the compensation of claims of American military and civilian personnel who had suffered losses as a result of enemy action during the war. However, plaintiff was not allowed to recover under this act until an amendment was passed in 1962,[3] which allowed for the compensation of claims by United States nationals attributable to the loss or destruction of property located in Germany and Czechoslovakia.

In 1950 the International Claims Settlement Act of 1949 [4] was passed which was designed to compensate American citizens for their losses stemming from nationalizations or other such losses caused by certain foreign governments. The 1958 amendment [5] to this act authorized the payment of claims against the Government of Czechoslovakia based on nationalization and confiscation of American property in that country.

Plaintiff filed a claim under the 1958 amendment for the loss of its two plants

---

1. The groundwork for the Conference at Potsdam (July 17–Aug. 2, 1945) had been laid previously at the Yalta Conference in early February of 1945. At Yalta, the United States, the United Kingdom, and the Soviet Union agreed that upon the final defeat of Germany, each power (and possibly France) would take control of a separate "zone of occupation." It was further agreed that, within 2 years from the surrender of Germany, removals of all industrial equipment, machine-tools, ships, rolling stock, etc., located on German territory, should be made for the purpose of "destroying the war potential of Germany."

2. 50 U.S.C.App., §§ 2001–2017p (1964), *formerly* 62 Stat. 1240 (1948).

3. War Claims Act of 1948, 50 U.S.C.App. § 2017 et seq. (1964).

4. 22 U.S.C. §§ 1621–1643k (1964), *formerly* 64 Stat. 12 (1950).

5. International Claims Settlement Act of 1949, 22 U.S.C. § 1642 (1964).

in Czechoslovakia and received an award covering the value of the properties. This award of $685,452.03 consisted of principal amounting to $451,600 plus interest ($233,852.03) at the rate of 6 percent per annum from 1949 to 1958. Plaintiff's claim for loss of profits was denied. Since the Czechoslovakian claims fund was insufficient to cover all the awards in full, plaintiff was awarded a pro rata share of the fund which came to $37,302.25.

When the 1962 amendment to the War Claims Act was passed, plaintiff proceeded to file two claims with the Foreign Claims Settlement Commission.[6] In one claim plaintiff was seeking additional compensation for the loss of the properties in Czechoslovakia. This claim was rejected because the loss was due to a postwar nationalization rather than as a direct consequence of "special measures" taken by German authorities. Plaintiff's second claim was for the loss of its plant in East Germany. In this action, plaintiff was awarded the sum of $462,528.52 —an amount equal to the physical value of the plant at the time it was seized by

Germany in 1942. Because plaintiff was found to be a small business concern, the award was paid in full.[7] However, no interest was paid on any awards under the General War Claims Program.

Later in 1967 plaintiff filed a declaratory judgment action in the United States District Court for the District of Columbia, seeking to recover the full value of its lost properties, including interest and loss of profits. Plaintiff also applied for injunctive relief and sought the convening of a three-judge court. Plaintiff's request for a three-judge court was denied on May 1, 1967,[8] and this decision was affirmed on appeal to the United States Court of Appeals for the District of Columbia Circuit on May 16, 1967.[9] Thereafter, on September 8, 1967, plaintiff's suit in the district court was dismissed for lack of jurisdiction.[10] On November 21, 1968, plaintiff filed suit in this court seeking full compensation for the value of its properties in East Germany and Czechoslovakia which were allegedly taken by the United States.[11]

6. The Foreign Claims Settlement Commission, established by Reorganization Plan No. 1 of 1954, 68 Stat. 1279 (1954), 5 U.S.C. § 133z-15 (1964), is the successor agency to the War Claims Commission created by the War Claims Act of 1948 and the International Claims Commission created by the International Claims Settlement Act of 1949.

7. War Claims Act of 1948, 50 U.S.C.App. § 2017l(a) (1) (1964), authorizes the Secretary of the Treasury to make full payment of awards to claimants certified by the Small Business Administration as having been, on the date of the loss, a small business concern within the meaning of the Small Business Act.

8. Aris Gloves, Inc. v. Re, Civil No. 929–67 (D.D.C., May 1, 1967). In reaching his decision, Judge Walsh concluded that plaintiff had no vested property interest, protected by the fifth amendment, as the result of Title II of the War Claims Act of 1948; that there existed no constitutional question under the "just compensation" clause or the equal protection clause; that the question of payment of interest involved only an interpretation

of the statute in question and not an illegal delegation of legislative authority; and that there was no question raised as to the constitutionality of a United States statute.

9. Aris Gloves, Inc. v. Walsh, No. 20,984 (D.C.Cir., May 16, 1967).

10. Aris Gloves, Inc. v. Re, Civil No. 929–67 (D.D.C., Sept. 8, 1967). Judge Holtzoff, in his order, stated that "if plaintiffs have a valid claim under the Fifth Amendment, this Court lacks jurisdiction over the subject matter."

11. Plaintiff's petition, in this case, seeks compensation for the value of its properties taken in both Germany and Czechoslovakia. However, in its cross-motion for summary judgment, plaintiff completely fails to make reference to its Czechoslovakian claim. At oral argument, plaintiff's counsel stated that Aris Gloves, at the moment, was seeking recovery only for its loss of property in East Germany. He conceded that the Czechoslovakian claim involved other and different issues from the German claim, and, consequently, the Czechoslovakian

Plaintiff's leading argument is that its property in East Germany was unlawfully taken by the United States in violation of the just compensation clause of the fifth amendment. In order to understand plaintiff's rather unique fifth amendment position in this case, it is best to outline its "taking" argument in full.

In April or May of 1945, United States forces completely took control from the Germans of the territory in East Germany containing plaintiff's glove manufacturing plant. Prior to this time, the United States had agreed at the Yalta Conference [12] to allow Russia to dismantle and remove German industrial plants in settlement of Russia's reparation claims against Germany. By July of 1945, the United States knew that Russia was in fact removing not only German properties but also properties belonging to United States nationals.[13] Aware of this fact, the United States still went ahead and agreed at the Potsdam Conference to turn over the territory which it was occupying in East Germany to the Soviet Union without demanding full compensation for the loss of any property belonging to a United States citizen. There had, in fact, been a proposal drafted by the United States delegation to Potsdam which offered a plan whereby United States nationals owning property in Germany would be compensated for any losses sustained as the result of the removal of such property for war reparations. However, this proposal was never

discussed at the Conference, and ultimately it was withdrawn by Secretary of State Byrnes on August 1, 1945—1 day before the close of the Conference.[14]

Plaintiff contends that the above set of circumstances amounted to a taking of its property by the defendant without just compensation. Plaintiff argues that the signing of the Potsdam Treaty, relinquishing control of the territory containing plaintiff's glove manufacturing plant, and the failure of the United States to press for compensation for the loss of property belonging to American citizens, in essence, amounted to a licensing of the Russian government to dismantle and carry away plaintiff's property without having to pay compensation. Consequently, it is plaintiff's position that the United States should be obliged to compensate it for its losses since defendant failed to protect its property interests, and since defendant even went to the point of actually authorizing a third party to take control of plaintiff's property without first requiring just compensation.

■ In answering plaintiff's argument, defendant contends that there was no taking at all by the United States, but rather that the taking of plaintiff's property was accomplished by the Soviet Union, for whose actions the United States can not be made liable. Defendant further argues that, if there was a taking, it was justified since it was the result of belligerent occupation by the United States. To support this conten-

---

question would be handled separately in another action.

In the best interests of justice, we will consider plaintiff to have withdrawn its claim in this suit for compensation for loss of property in Czechoslovakia, rather than hold that such claim is waived and thereby lost. This decision will be without prejudice to the right of plaintiff to file another action in this court for the recovery of the value of its property located in Czechoslovakia.

12. See note 1 *supra* and acompanying text.

13. Letter from Edwin W. Pauley to James F. Byrnes, July 27, 1945. In this letter, Pauley, who was the representative on

the Allied Commission on Reparations, stated that the Russians had virtually removed all machinery from five plants located in the American area of Berlin —two of the plants being the property of the International Telephone and Telegraph Company. Pauley also noted that such removals were in complete violation of efforts to maintain "non-war potential" industries in Germany, thereby not completely destroying all opportunities for employment.

14. It appears that the proposal was circulated to the British and Soviet delegations but apparently was never discussed.

tion, defendant refers to the general rule that all property located in enemy territory, regardless of its ownership, is in time of war regarded as enemy property subject to the laws of war. Young v. United States, 97 U.S. 39, 24 L.Ed. 992 (1877); Lamar v. Browne, 92 U.S. 187, 23 L.Ed. 650 (1875); Juragua Iron Co. v. United States, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520 (1909).

■ This court will readily concede that it was not necessary for the defendant to have actually taken physical possession of plaintiff's property in order for there to have been a fifth amendment taking. A taking can occur simply when the Government by its action deprives the owner of all or most of his interest in his property. *See* R. J. Widen Co. v. United States, 357 F.2d 988, 993, 174 Ct.Cl. 1020, 1028 (1966); United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Just as a taking can occur when the owner is deprived of the use of his property, United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), so also can there be a taking if the Government makes it possible for someone else to obtain the use or benefit of another person's property. *E. g., see* Eyherabide v. United States, 345 F.2d 565, 570, 170 Ct.Cl. 598, 606 (1965), where the court remarked: "If the Government's encroachments on private property make it possible for another to get the benefits of that property, the United States is liable just as if it used the property for itself." Thus, it is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases. *See* United States v. Causby, *supra,* 328 U.S. at 261, 66 S.Ct. 1062; R. J. Widen Co. v. United States, *supra,* Eyherabide v. United States, *supra.*

■ The fact remains, however, that despite the existence and validity of these general principles governing the definition of a taking, they still do not create a fifth amendment violation in the instant case. Despite all the many cases cited by plaintiff to support its general

rules of law, not one of them deals with a factual situation similar to the present case. The question of whether there is a fifth amendment taking cannot turn simply on general principles of law; it must be based on the particular circumstances of each case. *See* United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Consequently, our decision is based not only on the general rules relating to the just compensation clause, but also on a careful consideration of the unique factual situation which exists in the present case.

■ The prime situation which did exist at the time of the alleged taking was that the United States was engaged in a war. Therefore, this case must be governed by those taking cases which deal with wartime appropriations of individually owned property. The case of Juragua Iron Co. v. United States, *supra,* was one in which there was a taking of American-owned property located in foreign enemy territory by American military forces during a period of war. Thus, this case presents a factual situation which contains the same basic elements as the case at hand. The Court in *Juragua* held that despite the fact that the land appropriated for military use was owned by an American citizen, the taking still would be governed by the general rule that property found in enemy territory is enemy property regardless of the status of the owner. *See* Lamar v. Browne, *supra.* The Court of Claims, which initially decided the *Juragua* case, stated in its opinion:

> The law seems to be well settled that when a citizen of one belligerent country is doing business in the other belligerent country, and has built up and purchased property there which has a permanent situs, such property is subject to the same treatment as property of the enemy. * * *

Juragua Iron Co. v. United States, 42 Ct.Cl. 99, 111–112 (1907). On appeal, this idea was affirmed emphatically by

the Supreme Court.[15] The mere fact that the property taken in *Juragua* was physically occupied by American military forces, whereas there was no physical occupation in the instant case, should not be a distinguishing factor since, as we have already conceded, actual physical taking is not necessary in order for there to be a fifth amendment violation. The fact remains that in both cases there was an exercise of control by the defendant over the plaintiffs' property, such that each plaintiff lost possession of its property. We feel that just as the Court in *Juragua* found that there was no taking compensable under the fifth amendment, so we likewise hold that there was no taking in this case which should be compensated under the fifth amendment.

It should be noted further that the Court of Claims in deciding *Juragua* even went to the point of ruling that if the plaintiff's property was not considered as "enemy property," there would still be no means of recovery for the plaintiff since the destruction of the property was justified by the necessity of carrying on military operations. *Cf.* Pacific R. R. v. United States, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634 (1887). Despite the fact that the Supreme Court did not directly affirm this particular point on appeal, it is obvious from the Court's opinion that its decision was based upon the necessities created by the existence of a state of war. In United States v. Central Eureka Mining Co., *supra,* the plaintiff mining company argued that the order of the War Production Board in 1942, directing all nonessential gold mines to cease operating, amounted to a taking of its right to mine gold. The Court noted that the purpose of the order was to conserve equipment and manpower for essential war uses, and that, therefore, the regulation was not arbitrary or unreasonable. In accordance with the reasoning of the Supreme Court in *Eureka,* we feel that certain governmental actions which might appear to be a taking should not be so labeled when they are the result of a wartime situation.

■ The plaintiff here argued that, for all practical purposes, there was no longer a wartime situation in existence at the time of the Potsdam Agreement on August 2, 1945. For instance, it pointed out that open hostilities had ceased with the unconditional surrender of the German armed forces on May 8, 1945. However, it seems to be generally well-accepted that the mere cessation of hostilities does not necessarily terminate the war power. Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947). The war power continues past the end of hostilities and into that period during which the evils which gave rise to the hostilities are sought to be remedied. Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 163, 40 S.Ct. 106, 64 L.Ed. 194 (1919); Stewart v. Kahn, 78 U.S. (11 Wall.) 493, 509, 20 L.Ed. 176 (1870). Moreover, it was not until December 31, 1946, more than a year after Potsdam, that the President declared an end to armed hostilities.[16]

■ Plaintiff further argued that it was entitled to recover based on Seery v. United States, 127 F.Supp. 601, 130 Ct. Cl. 481 (1955), Turney v. United States, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953), and Gray v. United States, 21 Ct.Cl. 340 (1886). In *Seery,* the distinguishing

---

15. The Court stated:
 " * * * The plaintiff, although an American corporation, doing business in Cuba, was, during the war with Spain, to be deemed an enemy to the United States with respect of its property found and then used in that country, and such property could be regarded as enemy's property, liable to be seized and confiscated by the United States in the progress of the war then being prosecuted; indeed, subject under the laws of war to be destroyed whenever, in the conduct of military operations, its destruction was necessary for the safety of our troops or to weaken the power of the enemy." Juragua Iron Co. v. United States, 212 U.S. at 306, 29 S.Ct. at 388.

16. Proclamation No. 2714, 61 Stat. 1048 (1947).

factor is that the plaintiff's land, which was taken in 1945 by American military forces for use as an officers' club, was located in Austria, and the court noted that not only was Austria not enemy territory at the time of the taking, but also that Austria had never been considered to be enemy territory. In the instant case, there can be no question but that the territory containing plaintiff's East German plant was located in what the United States considered as "enemy territory." The important point decided by the court in *Turney* was that the just compensation clause applied to the taking of property not located in the United States. Since this point is not in dispute in this case and since *Turney* did not deal with a taking having a wartime purpose, the case is not really applicable to the present controversy. All that really needs to be said about the *Gray* case is that the opinion by the court was strictly an advisory opinion which was not binding upon either of the parties and cannot be binding upon subsequent courts. However, it is worth mentioning that, in referring to the "French Spoliation" claims which were later granted by Congress following the *Gray* opinion, the Supreme Court remarked: "We think that payments thus prescribed to be made were purposely brought within the category of payments by way of gratuity, payments as of grace and not of right." Blagge v. Balch, 162 U.S. 439, 457, 16 S.Ct. 853, 856, 40 L.Ed. 1039 (1896).

Plaintiff, in making its argument that there was an unlawful taking of its property by the United States, in essence, is requesting this court to say that that part of the Potsdam Treaty calling for the relinquishment of the East German territory to the Russians was a violation of plaintiff's constitutional rights. In other words, defendant, by signing the Potsdam Agreement, violated the fifth amendment, since supposedly it was at this time that the so-called license to dismantle and remove was given to the U.S.S.R.

The making of treaties is a power delegated to the President with the advice and consent of the Senate. The negotiation of treaties is a matter solely within the discretion of the President. Since the content of treaties is so closely intertwined with political and international affairs, courts should be hesitant to interfere in any way with the wording or intent of a treaty. Only in cases where the Chief Executive has clearly violated a provision of the Constitution and denied a citizen of this country his full rights should a court seek to interfere with the treaty making power of the President. *See* Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642 (1890); The Cherokee Tobacco, 78 U.S. (11 Wall.) 616, 620–621, 20 L.Ed. 227 (1870); *cf.* Milliken v. Stone, 16 F.2d 981 (2d Cir.), cert. denied, 274 U.S. 748, 47 S.Ct. 764, 71 L.Ed. 1331 (1927). Since we have already held that there has been no taking of plaintiff's property in violation of the fifth amendment, there is clearly no violation of a constitutional provision by the Potsdam Agreement. Consequently, we do not find it necessary or provident to examine in detail the reasoning behind the decision of the American delegation to relinquish plaintiff's property to Russia without making a request for compensation.

Plaintiff seems to place a lot of reliance on the failure of defendant to press for the passage of the proposal drawn up by the United States delegation, calling for compensation of United States nationals by the Soviet Union. However, we do not feel it is within our province, in the absence of any clear violation of a constitutional provision, to examine the political and diplomatic reasons for the withdrawal of this proposal by the Secretary of State. Instead, we must assume that there was a sound basis for this decision just as we assume that the United States Government acted wisely and in the best interests of this country in agreeing at Potsdam to the dividing of Germany into zones of occupation.

It would be interesting to speculate what plaintiff's position would be had

the United States presented its proposal calling for compensation, only to have it rejected by the U.S.S.R. Would this one step have been enough to satisfy plaintiff that the United States should not be liable for the loss of its property? Suppose the proposal had become a part of the Potsdam Treaty, and later Russia had refused to abide by it. Would plaintiff require the United States to take further action to see that it received its just compensation, or would the defendant have fulfilled its duty simply by having made the compensation provision a part of the agreement? In other words, what steps should defendant have taken in order not to be guilty of the alleged taking of plaintiff's property? Where does one draw the line? It could be argued that there was always one more step the Government could have taken to protect the property of its citizens. This court in the early French Spoliation case of Adams v. United States, 23 Ct.Cl. 226, 253 (1888), directed itself to this question of just how far the Government must go to protect the claims of its citizens. The court, quoting from 6 Memoirs of John Quincy Adams 383 (C. Adams ed. 1874), which was cited in 2 A Digest of the International Law of the United States, 707–08 (F. Wharton ed. 1887), stated:

"A government which neglects properly to present the claim of one of its citizens to a foreign government, in consequence of which such claim is lost, is not necessarily bound to make good the claim. The argument of the abstract right is strong, but as the justice obtainable from foreign nations is at all times, and under every state of things, very imperfect, and as the only alternative in cases of denial of justice is the abandonment of the claim or war, a nation by abandoning the claim, after exhausting every specific expedient for obtaining justice, neither partakes of the injustice done nor

makes itself responsible to the sufferer; for war, even if it eventually obtains justice for that sufferer, secures it by the sufferings of thousands of others equally unmerited and which must ultimately remain unindemnified. And mere inability to obtain justice can not incur the obligation it is unable to enforce."

In addition to its claim founded on the fifth amendment, plaintiff also claims compensation based on an implied contract. Plaintiff contends that defendant impliedly agreed to compensate it for the loss of its properties in East Germany on three separate occasions: (1) in 1945 at Potsdam when defendant licensed the Soviets to dismantle and remove plaintiff's property; (2) in 1946 by the Paris Reparation Agreement [17] releasing any claims plaintiff might have against Germany for losses sustained during the war; and (3) in 1948 as a result of the War Claims Act.

Plaintiff, in its motion for summary judgment, admitted that if there was no valid fifth amendment claim, there would be no implied contract claim which could be sustained on the basis of the Potsdam Agreement. We agree; and since we have already held that there is no right of recovery based on the fifth amendment, then obviously plaintiff's implied contract action must also fail. See R. J. Widen Co. v. United States, supra, 357 F.2d at 992, fn. 8; United States v. Lynah, 188 U.S. 445, 459, 23 S.Ct. 349, 47 L.Ed. 539 (1903).

Plaintiff's reliance on the Paris Reparation Agreement as the basis for its contract claim is misplaced since this agreement was a pact between the United States and 17 of its Allies whereby each country would limit its war claims and those of its citizens to the proceeds of certain German assets which had been seized during the war. There is nothing in this agreement from which a promise

17. Agreement with Other Governments Respecting the Distribution of German Reparation, the Establishment of an Inter-Allied Reparation Agency, and the Restitution of Monetary Gold, Jan. 14, 1946, 61 Stat. 3157 (1947), T.I.A.S. No. 1655.

can be implied by the defendant to compensate plaintiff for the loss of its German properties.

 In regard to plaintiff's allegation that the War Claims Act of 1948 represented a promise by defendant to pay plaintiff for its war losses, it is sufficient to say that, as a general rule, where the United States Government establishes a national fund out of which claimants can assert their claims against a foreign government, this does not in any way make the United States liable for any unpaid portion of the claim. Instead, payments by the United States in these situations are simply gratuities incapable of establishing any legal liability. *Cf.* Bayard v. United States, 127 U.S. 246, 8 S.Ct. 1223, 32 L.Ed. 116 (1888); *see generally* Adams v. United States, *supra*, 23 Ct.Cl. at 253; 3 M. Whiteman, Damages in International Law 2046–51 (1943). This idea is also supported by section 7(f) of Title I of the International Claims Settlement Act of 1949, 22 U.S.C. § 1626(f) (1964), which provides:

> Nothing in this subchapter shall be construed as the assumption of any liability by the United States for the payment or satisfaction, in whole or in part, of any claim on behalf of any national of the United States against any foreign government.

As a result, we do not find that there is any basis upon which plaintiff can contend that it is entitled to recover on an implied contract.

In light of the fact that plaintiff has been unable to establish that it is entitled to recover based either on the just compensation clause of the fifth amendment or on an implied contract, we do not find it necessary to consider defendant's arguments of res judicata, statute of limitations, and finality of decisions of the Foreign Claims Settlement Commission. We hold, therefore, that there has been no taking of plaintiff's East German property by the defendant which is compensable under the just compensa- tion clause of the fifth amendment, and that plaintiff is not entitled to recover on the basis of an implied contract. Plaintiff's cross-motion for summary judgment is denied; defendant's motion to dismiss is denied; and defendant's motion for summary judgment is granted. Plaintiff's petition is dismissed.[18]

NICHOLS, Judge (concurring).

I join in the judgment of the court and in the opinion except where it is inconsistent with what follows.

Plaintiff cites and relies heavily upon Gray v. United States, 21 Ct.Cl. 340 (1886). This is one of the most interesting and able decisions of our predecessors on the subject of Fifth Amendment takings, and respectfully I do not agree with the court's handling of it. True, it was an advisory opinion only. The alleged taking occurred in 1800, and was never within our jurisdiction to adjudicate. The Congress, until recently, often requested advisory opinions of this court and they were furnished, as in *Gray*. Such opinions of course were not "binding" but I never supposed that lawyers were not to invite attention to them as precedents. That is all plaintiff seeks to do here. Moreover, the Congress chose to enact relief legislation pursuant to our advice *ex gratia*, without fully accepting our Fifth Amendment theory or rejecting it either. The quoted language of the Supreme Court in Blagge v. Balch, 162 U.S. 439, 457, 16 S.Ct. 853, 40 L.Ed. 1039 (1896) points this out, but I do not read it as expressing any disapproval of this court's position concerning the Fifth Amendment.

For a full appreciation of the logical structure the *Gray* opinion erects, there can be no substitute for reading it, but the following summary is attempted. In 1778, seeking to obtain the French alliance that ultimately made possible the victory at Yorktown, our Government made various promises by treaty. Among them was one that we would thenceforward defend the French West

Indian possessions against attack by any other power. In the wars of the French Revolution and Empire commencing in 1793, the British attacked and captured several of those possessions without our Government's lifting a finger. There were doubtless good reasons for this, but the impression in Paris was painful. Our merchant shipping during the time of those wars was large, and it was for the most part undefended. Many American ships were taken by the combatants, some in the exercise of lawful belligerent rights, some otherwise. The French captured maybe more than their share. The "quasi-war" with France was an effort to give our flag afloat some protection against the French. In 1800 we sent a delegation to Paris to negotiate outstanding differences. They brought up the "French Spoliation Claims", as they were always afterwards called, for lawless captures of shipping. The French responded with their complaint that we had not observed our 1778 commitment, a grave breach of faith as they viewed it. It looked as if this albatross would hang from our national neck from that time onward unless a release was purchased. Having nothing else to purchase it with, our negotiators used the Spoliation claims. A treaty surrendering them and releasing our 1778 promise was duly made and the Senate ratified it in due course.

This court considered that under international law many of the claims were valid and would eventually have been honored. Similar claims against other countries were, in fact, settled and paid by them, as were claims against France herself that accrued after 1800. The holders of certain particular claims were thus singled out to make a sacrifice for the general good that was not required of others similarly situated. We held that their property had been taken without just compensation.

Many statesmen of the generation that wrote the Bill of Rights were of the opinion that a Fifth Amendment taking had occurred. A smaller number were of a contrary view. The matter was agitated but progress towards its resolution was not made until the Congressional request to this court for an advisory opinion, in 1885.

It would appear as an unspoken major premise that claimants were able in 1800 to invoke canons of international law that were generally agreed upon, canons which no important maritime nation would put itself in the position of repudiating. These assumptions still stood as valid in 1886. The retreat of law from the oceans has been since then, so precipitate, that it is difficult for us now to put ourselves into the state of mind of the *Gray* court, but to understand the decision we must do so. To apply it as a precedent today, we must consider to what extent conditions have changed and to what extent they remain the same.

*Gray* thus appears to me to teach a technique rather than a rule. To follow it, we would have to piece together the historical elements, patiently and carefully, item by item, as the *Gray* court did, until finally a structure stands that is or is not recognizable as a Fifth Amendment taking. Plaintiff has not undertaken to show us how to do this. It seems to imagine that every decision of our Government for whatever reasons not to try to protect the property of United States citizens against spoliation abroad, is a Fifth Amendment taking. The *Gray* court would have been the first to repudiate such a notion and the whole course of its reasoning is to the contrary. This court today quotes John Quincy Adams to good effect a passage used with approval as the court says in Adams v. United States, 23 Ct.Cl. 226, 253 (1888). It remains to add that the same Judge, John Davis, was the author of both the *Gray* and *Adams* opinions. From this fact, with the nearness in time, we may be sure that the then Court of Claims saw no conflict between the quotation and its holding in *Gray*, and indeed there is none.

It appears to me that to satisfy the *Gray* court, plaintiff here would have had to show as a minimum (a) that the acts of the USSR in seizing United

States owned plants in East Germany as "reparations" were contrary to international law, (b) that the USSR's authorities would sooner or later have acknowledged the fact and paid compensation to the United States owners, and (c) that the United States representatives at Potsdam knowingly surrendered this possibility of compensation in return for concessions by the USSR in unrelated areas. Plaintiff has not even demonstrated proposition (a), still less the others.

I do not agree that the *Gray* decision is any kind of cloud or embarrassment on the decision we reach today, and therefore I see no need to consider if it was correctly decided. If it was, and should be regarded as a valid precedent, the decision we reach is not altered.