Donald Wayne **MORRISON**

v.

The **UNITED STATES.**

No. 49–71.

*United States Court of Claims.*
Feb. 20, 1974.

Thomas M. Gittings, Jr., Washington, D. C., attorney of record, for plaintiff; Jack J. Helms, Homerville, Ga. and P. Baxter Davis, Washington, D. C., of counsel.

Alan L. Ferber, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant; Judith Ann Yannello, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court having been submitted on plaintiff's exceptions to the recommended decision, filed April 26, 1973, by Trial Judge Kenneth R. Harkins pursuant to Rule 134(h). The court has considered the case on the briefs of the parties with oral argument of counsel. Since the court agrees with the recommended decision of the trial judge, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

On July 31, 1968, plaintiff was a Sergeant E–5 in command of a squad of the 3d Platoon, B Company, 1st Battalion, 50th Infantry, on a search-and-destroy patrol in the Central Highlands of South Vietnam. During the course of this patrol, plaintiff's squad searched a cave and discovered, among other items, $150,000 in United States currency and 550,000 South Vietnamese piasters. The $150,000 in United States currency and the South Vietnamese piasters were turned over to plaintiff's platoon leader and through channels, delivered to the custody of defendant. Plaintiff contends that he is a "finder" of "treasure trove," and that defendant's refusal to deliver the money to him constitutes a taking of private property for public use without just compensation in violation of the 5th amendment of the Constitution of the United States.

■ Plaintiff is not a "finder" of the $150,000. When plaintiff discovered the money and took it into possession, he did so as an agent of the United States; the $150,000 was "captured" public property taken from the enemy or "abandoned" property within the meaning of Article 103 of the Uniform Code of Military Justice.[1] Accordingly, plaintiff's petition must be dismissed.

During the period of United States military commitment in South Vietnam, January 1961 until February 1973, the nature of United States participation in combatant activities underwent substantial change. In July and August 1968, when plaintiff's claim arose, United States military operations in the Central Highlands of South Vietnam required relatively large geographic areas to be the responsibility of a limited number of troops. Plaintiff's unit, the 50th Infantry (Mechanized), was attached for operational purposes to the 173d Airborne Brigade, which, with a total of six battalions, was responsible for United States troop operations that extended into three Vietnamese provinces.

The terrain over which the 173d Airborne Brigade operated included coastal flatlands and mountainous jungle. Contact with the North Vietnamese and Vietcong enemy in the Central Highlands in this period was sporadic, and in the main was limited to situations selected by the enemy. Enemy activity consisted of guerrilla operations, hit-and-run raids, placement of mines, ambushes, and sniper action. There were very few contacts that involved fire

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed April 26, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. 10 U.S.C. § 903 (1970).

fights that would be classified as major engagements.

United States and South Vietnamese forces in this period in the Central Highlands primarily were engaged in intelligence surveillance, monitoring operations, search-and-destroy patrols, and maintenance of supply lines. The 1st Battalion of the 50th Infantry in May 1968 had a major contact with the enemy in which a number of its tracked vehicles were destroyed or damaged and, as a result, for a time thereafter it was assigned primarily missions that required dismounted activities. The 1st Battalion in July and August 1968 was employed on patrol missions in the jungle as regular dismounted infantry.

The patrol during which this claim arose commenced on July 29 and extended for 20 to 24 days into the middle of August 1968. It was carried in the 173d Airborne Brigade's reports as part of Area of Operation Dan Sinh, or alternatively, Operation Cochise, that had been under way in the general area of Landing Zone Uplift since March 1968. Operation Cochise was a continuing activity of the 173d Airborne Brigade that involved numerous combatant contacts with the enemy at many locations throughout the brigade's assigned areas of responsibility. Reports on activities in Operation Cochise from July 29 through August 3, 1968, make it clear that the various units in the several task forces involved continuously participated in military activities in a hostile area that contained enemy forces.

In the latter part of July 1968, the 173d Airborne Brigade Operations Officer (the S–3) and the 173d Airborne Brigade Intelligence Officer (the S–2) received information that indicated that the 3d North Vietnamese Division and Military Region 5 of the Vietcong had a base camp and a headquarters located in the Vinh Thanh Mountains in the area of Operation Cochise. According to this information, these forces were scheduled to have a high-level conference in this area in late July 1968. The S–3 assigned Task Force 1–50 the mission of

searching for, locating, and attempting to disrupt this conference.

On July 28, 1968, troops of A Company of the 1st Battalion, 503d Infantry, part of Task Force 1–50 and of Operation Cochise, on patrol in this area had discovered the site of a field hospital used by the North Vietnamese and Vietcong forces. This hospital was located in a cave and tunnel complex that contained four large rooms that were approximately 60 feet long and 20 to 30 feet high. A more intensive search was ordered to be conducted in that part of the mountains where the hospital complex had been discovered.

B Company of the 1st Battalion, 50th Infantry, at a strength of approximately 75 men, was ordered into the field on July 29, 1968. B Company had three rifle platoons, one of which included plaintiff's squad of approximately eight men. On this patrol, plaintiff's platoon leader was a newly arrived officer who was undertaking his first patrol. At this time, plaintiff had participated in approximately 150 patrols from Landing Zone Uplift. None of plaintiff's prior patrols was into the immediate area designated for the July 29, 1968, patrol.

On July 29, 1968, troops of A Company of the 1st Battalion of the 50th Infantry (1–50) and of A Company of the 1st Battalion of the 503d Infantry (1–503) were already in the field, separated from the area assigned to B Company by approximately one-half mile. On July 29, 1968, both of these units had evidence of enemy contacts. A Company (1–50) found fresh blood trails in an area that it had shelled by artillery the previous night and A Company (1–503) had detained, interrogated, and removed by helicopter four individuals that were classified as prisoners of war.

The briefing for B Company's platoon leaders, in preparation for the mission, indicated that a search-and-destroy patrol was involved and that intelligence reports showed that an enemy force, from battalion to regimental size, was in the area to be patrolled. Neither the

briefing of the platoon leaders nor the briefing by plaintiff's platoon leader to his squad leaders indicated that there was anything exceptional in the patrol to be undertaken. The briefing indicated that the mission was to "look around" the area and that the patrol was just an "ordinary, regular" mission.

B Company was loaded aboard helicopters at Landing Zone Uplift in the late afternoon on July 29, 1968, and, after a 15-minute flight to the southwest, was dropped into a clearing on the side of a high hill in generally rough terrain. B Company immediately went into bivouac and the night of July 29 passed without contact with the enemy.

On July 30, 1968, B Company commenced a search of the hillside, generally working in a southeasterly direction toward the crest of the hill on which it was located. Movement was difficult. Trees and undergrowth restricted vision to a distance of 100 feet or less and rocky outcroppings on the steep hillside made progress slow. Only approximately 1,000 yards were covered. During the day no signs of enemy activity were found and no Vietnamese civilians, Vietcong, or North Vietnamese troops encountered. At approximately 4 p. m., B Company halted, established its perimeter, and spent the night of July 30, 1968, uneventfully.

Other units in Task Force 1–50 had contact with the enemy on July 30, 1968. The S–2 report for Operation Cochise states that C Company (1–50), in an area approximately 5 miles southeast of B Company's bivouac, encountered an ambush and engaged one individual with 81 mm. mortar fire. A check of the site showed several individuals had been there.

The money that is the basis for plaintiff's claim was discovered on July 31, 1968. On that day, B Company located and searched at least two caves that contained articles that were reported to brigade headquarters. The caves searched by B Company were located within 1,000 meters of the hospital cave and tunnel complex that had been explored on July 28 and where, on July 29, four prisoners of war had been detained. One of B Company's caves on July 31, 1968, was located and searched by plaintiff's squad; another squad in plaintiff's platoon located and searched the other cave. The reports of the S–2 and the S–3 located both of the caves at the same map coordinate.[2]

On July 31, 1968, B Company broke camp at about 7 a. m. and continued to advance toward the crest of the hill. Plaintiff's platoon was the lead platoon and plaintiff's squad was the "point." Plaintiff's squad was accompanied by a "Kit Carson" scout (a "rehabilitated" former member of the Vietcong), whose only known identification is "Pee Wee." Two platoons of B Company followed plaintiff's platoon in the advance and, when the caves were located, were deployed to provide protection while plaintiff's platoon conducted the search. During the advance, heavy undergrowth caused plaintiff's platoon to bunch together and plaintiff's platoon leader was admonished by the company commander to maintain a greater distance between his men. An effort was made to maintain a distance of approximately 10 to 25 meters between men when visual conditions permitted.

The first cave found by plaintiff's platoon in which items were reported as found was located at 10:08 a. m. One radio, some rice, and some clothing were located.[3] This first cave was found by another squad in plaintiff's platoon. Plaintiff did not participate in the

---

2. This does not mean that the two caves located and searched by plaintiff's platoon were at the identical physical location. The coordinate established the location of B Company, not the location of the platoon or squad. Additionally, a field reading on a map of the scale involved (1:50,000) would be subject to a margin of error of at least plus or minus 10 meters and could be subject to even a greater error.

3. The S–2 report, in the list of items found by B Company (1–50), states that parts of a "commercial" radio were found. Whether the radio was of a military type or commercial type is not significant.

search of this cave, and on July 31, 1968, was not aware that material had been found there.

At approximately 1:45 p. m., approximately 400 feet from the crest of the hill, in an area characterized by outcroppings of large rocks and boulders and by thick vegetation, a member of plaintiff's squad discovered an opening in the ground. Plaintiff's squad was ordered to enter and search the cave. At the time the search was made, plaintiff's platoon was protected for security purposes by deployed troops from the other platoons in B Company.

The entrance to the cave was a small opening between large rocks, which permitted only one man to enter at a time. The interior of the cave appeared to be a natural formation rather than a man-made structure and consisted of a large room approximately 20 feet by 20 feet with a 10-foot ceiling. At the rear was a second, smaller room, large enough for two to three people. Plaintiff's squad searched the cave and found a few articles of old and rotten civilian Vietnamese clothing, some pots or cooking utensils which did not appear to have been in recent use, and some small sheets of paper that contained oriental characters. At the rear of the cave, a United States Army .50 caliber ammunition can was located. Markings on the can showed that it had been manufactured in Homerville, Georgia. The ammunition can was opened and found to contain a quantity of South Vietnamese piasters.[4] The currency and the papers were turned over by plaintiff's squad to the platoon leader.

Plaintiff was the last to leave when the squad started to depart. Plaintiff flashed the beam of his flashlight around the cave and detected another object on top of a rock, about 10 feet above the floor, near the opening of the cave. Plaintiff called the members of his squad to return, and the squad members, followed by plaintiff's platoon leader, came back into the cave. Plaintiff boosted the Kit Carson scout to his shoulders, and the scout passed another ammunition can to plaintiff. This can was covered with dust and had a short length of old rope tied to the handle. The ammunition can was a United States Army .50 caliber container and markings showed that it also had been manufactured in Homerville, Georgia.

In the presence of the squad members and the platoon leader, plaintiff removed the lid of the can and observed that it contained three stacks of $50 bills of United States currency. Each stack contained five smaller packets of bills, tied with vines. When the can was opened, the bills were neatly arranged, and their condition indicated that they had been circulated.

There were no markings or indications in or on the can as to whom the money belonged, when the money had been placed in the can, or when the can had been placed into the cave. There was no indication as to when the cave last had been entered or used.

Sight of the American money generated considerable excitement in plaintiff's squad and order was restored only with difficulty. Some of the bills were grabbed and passed around, and it was proposed that the money be divided among the squad members for personal use. Plaintiff suggested to his platoon leader that the money should be split up among the squad members. After a warning by the platoon leader that the squad would get into trouble if they tried to divide the money, the excitement was calmed. The money was redeposited in the can, and possession of the can and the money was relinquished to the platoon leader. In due course, the papers and money were turned over to the company commander, reported by radio to brigade headquarters, and extracted by helicopter to brigade headquarters where a count was made. The can contained $150,000 in United States

4. The S–2 report states that $935,000 (VN) were found; the S–3 report states that 550,000 (VN) were found.

currency, all in $50 bills. Approximately 30 of the 3,000 bills were marked with oriental characters that subsequently were determined to be Chinese. No translation of the Chinese characters is available.

Plaintiff entered only one cave on July 31, 1968, and in that cave plaintiff did not observe any weapons, ammunition, rice, or other foodstuffs. On July 31, 1968, plaintiff did not observe any Vietnamese civilians, any members of the Vietcong, any North Vietnamese soldiers, or signs of any enemy activity in the area.

In summary, on July 31, 1968, in its search of caves in the area, B Company located, and the S–2 reported as found, parts of a commercial radio, one ton of rice, clothing, $150,000 in United States currency and $950,000 in Vietnamese piasters, one 75 mm. rifle round, and approximately 30 pounds of documents.

The S–2 report for July 31, 1968, includes other activities by Task Force 1–50. The Reconnaissance element (1–50) at 10:30 a. m., approximately 3 miles from plaintiff's cave, engaged and killed one Vietcong with small arms fire. Four pounds of documents were captured. At 11:05 a. m., A Company (1–50), less that a thousand meters from the cave, engaged with small arms fire one individual who was evading the area. A patrol from the Artillery element (1–50) found the bodies of two North Vietnamese, apparently killed by artillery approximately 4 days previously. The patrol also found a rocket launcher with two rounds.

During the night of July 31, 1968, plaintiff developed a toothache and was evacuated to Landing Zone Uplift early on August 1, 1968. B Company (1–50) continued to patrol on August 1 through 3 in the area where the caves were located, and at 11:15 a. m. on August 1, in another cave, reported at the same location as plaintiff's cave, found a typewriter, a Russian submachine gun, one 75 mm. rifle round, a diary, and an undetermined amount of documents and

clothing. Plaintiff's platoon, in the afternoon on August 1, in an area 100 meters west and 600 meters south of plaintiff's cave location, found a grave that, when opened, disclosed a badly decayed body dressed in khaki clothing. The S–2 report lists this as one North Vietnamese body, dressed in khaki uniform, apparently killed by artillery.

In its continued patrol in this area, B Company (1–50) found relatively little on August 2 and 3. At 5:20 p. m., on August 3, B Company, however, approximately 1,000 meters from the cave, located a sleeping area large enough for two companies, which appeared to have been recently used. An undetermined amount of documents were also found at that location.

On August 2, 1968, the Reconnaissance element (1–50) encountered a claymore boobytrap approximately 4 miles from the cave, which appeared to have been placed within the preceding 2 to 4 hours. On August 3, 1968, the Reconnaissance element (1–50) had one man set off a boobytrap suspended over the trail, approximately 5 miles from plaintiff's cave. There were four United States casualties, who were evacuated by helicopter.

B Company continued in the field for several weeks in other sections of the area of operations and, in the latter part of August, returned to Landing Zone Uplift by helicopter. During that part of the operation from July 29 through August 3, 1968, when examination of the cave and tunnel complex occurred, the troops of B Company were not fired upon and did not engage any North Vietnamese soldiers or Vietcong members. No evidence was found that enemy forces of regimental size operated in the areas that were searched by B Company. It is clear, however, that during this period, when the cave and tunnel complex was searched, the military forces of the Government of South Vietnam and of the United States did not have effective control of the areas in the Vinh Thanh Mountains in which Task Force 1–50 op-

erated. B Company, when it located and searched the caves on July 31, 1968, was in a combat operation in a high-risk area.

Plaintiff asserts that the $150,000 in United States currency constitutes "treasure trove" and from his capacity as a "finder" claims the right to its possession against all the world other than the true owner. The law of "finders" does not apply to this money. Plaintiff's rights are determined by statute and duly authorized administrative regulation. It is not necessary to resort to the ancient arcane principles that were developed in the Common Law of England prior to the American Revolution to determine the rights of a squad leader in the United States military forces to 3,000 United States $50 bills that were located in a cave in the Central Highlands of South Vietnam in the course of a search-and-destroy patrol.[5]

On July 31, 1968, plaintiff was subject to Article 103 of the Uniform Code of Military Justice.[6] This article deals with captured or abandoned property, and is derived from the constitutional power of Congress to "make Rules concerning Captures on Land and Water."[7] Article 103 requires military personnel on duty in a combat zone, on penalty of court-martial, to (a) secure all public property that is taken from the enemy and (b) turn over to the proper authority all captured or abandoned property in their possession, custody, or control. In addition, article 103 prohibits military personnel from buying, selling, trading, or dealing in captured or abandoned property on his own account or from engaging in looting or pillaging. Article 103 reflects the policy that a soldier may not make a profit out of the disorders of war. The article recognizes the difficulties involved in policing an army when abandoned property situations and looting situations are involved.

Field Manual 27–10, The Law of Land Warfare (July 1956), is a compilation and analysis of legal principles that relate to the conduct of land warfare. It is based upon treaties ratified by the United States, statutory law, and applicable custom. The purpose of the manual is to provide authoritative guidance to military personnel.[8]

---

5. The doctrine of "treasure trove" is of ancient origin and stems from the situations involved in the discovery of gold and silver coin, bullion, and plate that had been concealed in the ground by Roman conquerors when they were driven from the British Isles. Modern cases in the United States hold that the law of treasure trove has been merged with that of lost goods generally, at least insofar as the rights of the finder are concerned. "Lost" property is defined as that which the owner has involuntarily parted with, through neglect, carelessness, or inadvertence. "Mislaid" property is property which the owner intentionally places where he can again resort to it and then forgets. "Abandoned" property at common law was property voluntarily and unilaterally relinquished with no intent to reclaim. If concealed intentionally and deliberately, there could be no abandonment. The facts in this case show that the money was carefully placed in the cave. These common law concepts, applied to the facts of this case, would find that the $150,000 was "mislaid" and not "lost" or "abandoned." Schley v. Couch, 155 Tex. 195, 284 S.W.2d 333 (1955); Jackson v. Steinberg, 186 Or. 129, 200 P.2d 376 (1948), rehearing denied, 186 Or. 129, 205 P.2d 562 (1949): see also 1 Am.Jur.2d, Abandoned, Lost, Etc. Property §§ 4–5, 12, 15, 18–19, 21 (1962).

6. Article 103 provides:
   "(a) All persons subject to this chapter shall secure all public property taken from the enemy for the service of the United States, and shall give notice and turn over to the proper authority without delay all captured or abandoned property in their possession, custody, or control.
   "(b) Any person subject to this chapter who—
   "(1) fails to carry out the duties prescribed in subsection (a);
   "(2) buys, sells, trades, or in any way deals in or disposes of captured or abandoned property, whereby he receives or expects any profit, benefit, or advantage to himself or another directly or indirectly connected with himself; or
   "(3) engages in looting or pillaging; shall be punished as a court-martial may direct."

7. U.S.Const., art. I, § 8, cl. 11.

8. Chapter 1, § 1, Purpose and Scope, of FM 27–10, includes the following statement:
   "This Manual is an official publication of the United States Army. However, those

Chapter 6 of FM 27–10 deals with military relationships in occupied territory. Although the rules set forth in Chapter 6 "apply of their own force only to belligerently occupied areas," paragraph 352(b) provides that, as a matter of policy, the rules should "be observed as far as possible in areas through which troops are passing and even on the battlefield." Paragraph 396 declares that public property captured or seized from the enemy, private property captured on the battlefield, and abandoned property are property of the United States.[9] In the event it is unknown whether certain property is public or private, FM 27–10 states the property should be treated as public property until its ownership is ascertained.[10]

A directive of the United States Military Assistance Command [11] implements the provisions of article 103 for captured or seized currencies taken in field operations in Vietnam. This directive applies to all United States forces conducting operations within the Republic of Vietnam and was in force at the time plaintiff's squad located and searched the cave on July 31, 1968. MACV Dir. 37–20 applies to any currency, either public currency or private currency, including United States dollars, Military Payment Certificates (MPC), and GVN or NVN piasters, that United States forces personnel may capture or seize in the possession of a detainee or as part of a cache.

All public currency so taken is stated to be the "property of the United States Government." Public currency is defined as all currency which is the "property of the enemy force, state, government, or political subdivision thereof."

Private currency is property that can be identified by the individual who can establish ownership. Private currency is any currency seized or captured by United States forces personnel and "identifiable as the personal property of an individual." [12]

The source of, or the true owner of, the money located in the cave is unknown. The record does not establish the identity of the parties that deposited the money in the ammunition cans or placed the cans in the cave. No individual has identified or established a claim to the money as personal property. In the circumstances of this case, the $150,000 must be treated as public property unless or until the true owner identifies it and establishes a superior personal property right. Until proven otherwise, the currency found in the cave should be considered to be public curren-

---

provisions of the Manual which are neither statutes nor the text of treaties to which the United States is a party should not be considered binding upon courts and tribunals applying the law of war. However, such provisions are of evidentiary value insofar as they bear upon questions of custom and practice."

9. Paragraph 396, Title to Captured or Seized Enemy Property, provides:

"Public property captured or seized from the enemy, as well as private property validly captured on the battlefield and abandoned property, is property of the United States (see U.S.Const., Art. I, sec. 8, cl. 11), and failure to turn over such property to the proper authorities or disposal thereof for personal profit is a violation of Article 103 of the Uniform Code of Military Justice."

10. Paragraph 394, Determination Whether Property Is Public or Private, provides in part:

"c. *Property of Unknown Ownership.* If it is unknown whether certain property is public or private, it should be treated as public property until its ownership is ascertained."

11. MACV Dir. 37–20 (Aug. 15, 1967), as amended (Mar. 19, 1968).

12. Section 4 of MACV Dir. 37–20 reads as follows:

"4. *DEFINITIONS.* For the purpose of this directive, the following definitions pertain:

"a. Public Currency. Currency and cash monies, including US dollars, MPC, GVN or NVN piasters, and all other cash or currency, which is the property of the enemy force, state, government, or political subdivision thereof, captured or seized by US forces personnel.

"b. Private Currency. All cash and currency seized or captured by US forces personnel and identifiable as the personal property of an individual."

cy and, as such, the property of the United States Government.

■ When in the cave, and when he saw and took possession of the money, plaintiff was in a combat situation in an area not under effective control of either the South Vietnam forces or of the United States forces. If the currency was property of the enemy, it was taken in combat and is captured public property. As a general rule, all property located in enemy territory, regardless of its ownership, in time of war is regarded as enemy property subject to the laws of war.[13]

■ Hypothetically, the currency located in the cave could be considered to be private currency placed in the cave by unknown South Vietnamese or other civilian parties, or even by South Vietnamese or American military personnel. In such event, the $150,000 private currency would be contraband under local law and would be abandoned property as that term is used in article 103.[14] In article 103, the word "abandoned" covers not only property abandoned by the enemy, but also by civilian populations "in flight from the perils of the combat zone."[15] The term "abandoned" in article 103 is broader than the common law concept of "abandoned" property in that it includes property that was left behind or cast aside in situations where the right to possession was not voluntarily surrendered. In the circumstances of this case, the nature of the war in Vietnam would have caused any private owner of the money to abandon it to escape the "perils of the combat zone." No South Vietnamese or American, civilian or military, who had cached profits from black market operations would assert title to the money in the cave in the circumstances, particularly when its discovery occurred on a search-and-destroy patrol by heavily armed combat troops. In such event, the $150,000 would be private property cast aside and abandoned with no intent of asserting ownership or possessory rights.

Plaintiff's claim is disposed of by the nature of plaintiff's mission at the time the discovery was made. Seizure of the currency was plaintiff's military responsibility, and possession of the currency was taken as an agent of the United States. Plaintiff can assert no right to possession. This case is not concerned with, and no decision is made as to, what the result would be if plaintiff were not on a combat mission and acting well within the scope of his assigned official duties. Nor is this case concerned with a "finding" made by a member of an army of occupation or by military personnel in pursuit of wholly personal activities that lay outside the scope of assigned official responsibilities.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

13. Aris Gloves, Inc. v. United States, 420 F. 2d 1386, 1391, 190 Ct.Cl. 367, 374 (1970), and cases there cited.

14. Decree Law 17 of September 3, 1966, of the Government of South Vietnam requires all legal financial transactions to be conducted in South Vietnamese currency. Any person, in whatever capacity, owning or having possession of foreign currency is required to deposit or register it with a bank recognized by the Commissioner of Finance. Possession of undeposited or unregistered foreign currency is illegal.

15. Foster v. United States, 98 F.Supp. 349, 352, 120 Ct.Cl. 93, 99 (1951), cert. denied, 342 U.S. 919, 72 S.Ct. 365, 96 L.Ed. 687 (1952).